We have four cases on the calendar this morning, afternoon, sorry time flies, time flies when you're having fun. Two patent cases, a government employee case, a veterans case, and the last will be submitted on the briefs and not be argued. So our first argued case is Lazare Kaplan International v. Photoscribe Technologies et al., 2009-12-51, Ms. Maynard. Thank you, Your Honor. May it please the Court? My name is Deanne Maynard and I represent Lazare Kaplan International. The District Court in this case fundamentally misunderstood the patent claims, the prior art, and this Court's case law. That misunderstanding infected all of the Court's rulings, causing it to make multiple claim construction errors, to mislead the jury, and to find inequitable conduct when there was none. In my time this morning, although I'm happy to address… Afternoon. Thank you, Your Honor. Common mistake. Although I'm happy to address anything in the briefs this afternoon, I'd like to spend my time focusing on one of the Court's claim construction errors, that of the rigid frame limitation, and both of the Court's inequitable conduct rulings. We would also request that this panel consider holding its decision in this case, pending the en banc decision in the fair assent matter, as the principles there are likely to affect the principles governing this appeal. Well, if we're to do that in this case, I assume every other panel in this Court that has an inequitable conduct issue should also do it. I think it might depend on the case, Your Honor, but this case presents issues of materiality, of intent, and of balancing, which are all squarely at issue in the Court's request for briefing in the fair assent case. And so I think if there is a case to be held, it would be appropriate to hold this one. Let me ask you about inequitable conduct. Yes, Your Honor. Intent. You argue that there was no intent here, but the trial court felt awfully strongly that withholding the aggressor machine was highly material and withheld with intent to deceive. That's a finding of intent, isn't it? Well, Your Honor, the district court inferred its finding of intent from the fact that it believed the aggressor machine was highly material, which is an error of law under this Court's precedent. And also, his conclusion of materiality is based on his legally erroneous claim construction of the rigid frame limitation in Claim 18. The district court mistakenly believed that all the rigid frame limitation required was a rigid base with elements attached to it in some manner. But that's not the point of the rigid frame limitation in Claim 18. It's much more sophisticated than that. But didn't the district court understand the claim language with respect to the rigid frame, including all of the additional language following it about reducing vibrations and the like? And wasn't that essentially what the claim construction interpretation was, that the claim language itself was clear and in no need of any further interpretation other than to conclude that it did not require that the vibrations were completely eliminated? At the Markman hearing, Your Honor, that's correct. That's the conclusion. The dispute was about whether it completely eliminated vibration or whether only partially. And at the Markman hearing, the judge correctly interpreted the claim. But then when it came time to instruct the jury and when it came time to decide the inevitable conduct, the judge had reduced it to something quite different and something, in fact, inconsistent with its claim construction ruling. Because as it informed the jury, it said, I have one of these Webster's dictionaries in my office, and I'm going to read to you some definitions of rigid and frame. And the essence of what he told the jury is that he summed it up. He read the definitions. He picked some selection of rigid and some selection of frame. And then he summed it up for the jury. And he said, what it means is not pliant, not flexible. This is on A12, A13. A structure which is stiff, unyielding, firm, as rigid bars, using a steel bar as an example. So in effect, he backed off, I think, Judge Lynn, his claim construction at the Markman hearing, steel bars as an example. He went back to a firm base, which not only was inconsistent with his reading of it, only partially reducing, but also pointed the jury to only the question of whether or not the prior art had a firm base. And there's no dispute that the prior aggressor machine had an inch and a half thick aluminum base, and therefore was a thick base, and that the elements were in some way attached to it. But there was a colloquy with the court about that issue. And the court basically asked counsel, well, what is it you would have me do to sort of straighten out the record, to make sure the jury wasn't misled by my comments about the dictionary? And it seemed to me that the suggestion was, well, if you read this additional sentence, we're good to go. And he did read that sentence. He did read that sentence, Your Honor. But his cure, in the process of curing, he went back and said, and of course, you're also free to look back at the dictionary definitions I gave you early. So he went right back, and he didn't cure. He read the one sentence. And if I could back up more, because I think you're going to the issue of whether this was adequately preserved by trial counsel, and I believe that it was. Before he gave the instructions, the parties had agreed to a full set of complete instructions, and one of which was the Markman construction of rigid frame. And the judge said, absolutely not. I'm not going to give the agreed to instructions. And he gave his own. After he initially gave the dictionary definitions, trial counsel for LKI objected and said, Your Honor, this is an A664. We request that you read your Markman construction. No, because I've read the claim. Well, that misses the point, because obviously there was a dispute about what the claim meant. The claim wasn't sufficient. He refused to read his Markman instruction. He then did go on to the colloquy that you're discussing and discuss the definitionals. Is there something else I can do? Mr. Alcock told him, our position is there's nothing you need to do. It's totally fine. And LKI's attorney asked him to read three different places in the patent that LKI. But there was no request to either reiterate the claim construction from the Markman hearing or indicate to the jury that I have made a ruling on the meaning or anything of that sort. There was a request at A664, which was after he read the dictionary definitions, to read the Markman ruling. And he refused on the grounds that that was captured by the claim language, which I think misses the point of a Markman hearing. Obviously, there was a dispute in the Markman hearing, and there was a difference between the claim language and the Markman ruling that edified what it meant. But the question nonetheless remains as to whether the subsequent colloquy waived that objection. I think, Your Honor, under Second Circuit case law, once you've made your position clear to the judge and it's clear that the judge is not going to do what you ask, you are permitted to fall back and try to get what you can. And that is what counsel, I think, the accurate reading of the record here. And in any event, even if you think that ultimately agreeing to the judge's willingness to read only one sentence of the requested three portions of the specification that LKI's counsel subsequently requested was sufficient, the judge then, in fact, in the process of curing, said on A20, he did read the one sentence of the specification. And then he said, but if the dictionary definite helps you, then you're certainly free to use that. So he cured and then uncured, even if you think that the one sentence was a cure. Let me turn back to inequitable conduct for a minute. Is it your view that the judge concluded that LKI knew of the materiality of the prior aggressor machine or should have known? I think what he says is they must have known because I find it so highly, highly material. But that, again, is all based on his erroneous construction of the claim because he assumes that it was material because he thought the rigid frame limitation was captured by the aluminum base with the pieces attached to it. And there's no evidence in the record that none, in either the jury trial or the bench trial, that the pieces of the aggressor machine, the elements were attached in fixed relation to one another, which is the essence of the Claim 18 limitation and is the improvement captured by the Claim 18. And there's plenty of evidence in the record that the aggressor machine lacked the precision of the plus or minus accuracy unless it was floating on air, unless it was floating on the pneumatic legs. But that, too, was the improvement of Claim 18, the language of Claim 18 being that the elements are in fixed relation to resist differential movements of said laser, said optical system, and said stage, and increased immunity to vibrational misalignments. And the judge, he just didn't get it. And because he didn't get it, he thought it was so obvious. They should have provided the examiner with this heavy table that had pieces attached to it. But even if one thinks that the heavy table with pieces attached to it would have been important to the examiner, the examiner had other things sufficient. The aggressor patent was revealed. The aggressor machine, the existence of the machine was revealed. But the aggressor patent didn't show even a platform, let alone a frame, right? It didn't, but in the words of the judge, it must have been based on something. So the defendants point to nothing that revealing the structure of the aggressor machine would have added to what the examiner already had before him. Indeed, in response to a battle rejection in a parent patent, it had been disclosed to the examiner that the prior art had used heavy cement tables as a vibration dampening mechanism and other external damping mechanisms. That's at 1962 to 63 of the appendix. And that is exactly what the aggressor machine, all that it would have shown. And they point to pictures and manuals, but you can look at the picture and you can see all it would show you is that it was on this base, which nobody disputes. But it doesn't show you that the elements would have been attached in fixed relation. And all of the sites in the record to which they point don't show that. There isn't much in the patent itself, though, the 351 patent that shows any structure that attaches things to each other in a rigid way. That's true. There's a figure 14 is a diagrammatic view that just shows sort of an outline. It seems odd to be fighting about the meaning of rigid frame and whether a piece of prior art shows the structure that provides that kind of rigidity when the patent itself only diagrammatically shows, in effect, a box and says it's rigid. I don't think the patent says it's rigid, but to the extent the patent, there's no dispute that it was on this one-and-a-half-inch aluminum table. But the defendants can point to nothing about disclosing the structure of the machine that would have added to anything that the patent examiner had with respect to resisting vibration. And there were declarations about the quality of inscriptions obtained on the Gressor machine that were provided to the patent examiner that showed they didn't make the precision that the improvement does. And then Mr. Gressor testified himself at the trial that every time an 18-wheeler went by, every time an elevator went up in a building, the Gressor machine would have wavy lines caused by the vibration. And that's the improvement in 351. There is an interesting fact here, and that is that the prior Gressor machine was something that LKI was certainly aware of at the time this application was being prosecuted, and the same for the declaration with regard to the 938 patent. And there was a decision not to file it. Yes, Your Honor, and I would like to address the declaration if I may briefly. The declaration is there was a decision not to file it. At the same time, though, that they decided not to file it in the 938, they filed it in the 948 application, which was pending before the very same examiner. Under this court's law, that points away from an intent to deceive. In fact, it's hard to see how there could be any level of intent. Under FMC Corp. and Akron Polymer, that's the holding of this court. And what you're dealing with here is a professional judgment. The LKI relied on this. Attorneys make a professional judgment. And whether to put a thing in one and also in another is such a judgment. Nothing happened here that would warrant the unenforceability of the patent and the millions of dollars of attorneys' fees. The Rosario Declaration doesn't reveal anything that's not shown in the prior art. Both the Gressor, and this is another example of the district court just failing to understand what was going on. Both the Gressor and Winston patents reveal the ability to do the width and depth of inscriptions that are shown in the Rosario Declaration, which, keep in mind also, the Rosario Declaration didn't say anything about positional accuracy or positional repeatability, which was indeed the improvement captured by the claims at issue in the 938 patent. You are well into your rebuttal time. But since we asked a lot of questions, we'll give you a full three minutes. I appreciate that, Your Honor. Thank you. We'll hear from Mr. Alcock. We're now splitting your time. Yes, Your Honor. And I'll try to give you a little warning when you're down to about three or four minutes, but it's up to you to keep faith with your friend there. I will. May it please the Court. I would like to address mostly the intent issue. I was going to start with the 938, but I will start with the 351, since there was so much discussion on the rigid frame. Judge Lynn, I think you hit the nail on the head at the beginning of your questioning. The issue at the Markman wasn't about the rigidity of the frame or whether the elements were tied together. The issue at the Markman was whether or not it had to completely stop the vibration or just increase the immunity to the vibration. The judge ruled against us and said all it needed to do was increase the immunity. That's just what the claim language said. So later on at the jury instruction discussion that you earlier referenced, the judge basically said, look, there's nothing more to say on the Markman ruling other than what the claim says because all I said is I took what LKI was arguing, plain and ordinary meaning of the claim, and that's the way I went. But without the judge instructing the jury that he had made a ruling that the claim means what it says and that's what you're to go with, the jury would be free to refer to dictionaries or come up with whatever other definition they thought was appropriate. Yeah, but that's not what happened. I mean, what he did is instruct them basically on the claim language and said plain and ordinary meaning, which is the only thing that LKI asked him to do at the Markman hearing. I mean, we asked for more explicit construction. They said, look, just take the terms plain and ordinary meaning. So there was nothing to add in effect. The Markman ruling was effectively using the plain and ordinary meaning. But when LKI requested that he read the Markman ruling to the jury, he refused. Right, but it wouldn't have said any more than the terms increased immunity have their plain and ordinary meaning. I mean, that was the Markman ruling. Yeah, but isn't the jury entitled to know that? And wouldn't that normally be an appropriate instruction? Sure. But when the essence of the Markman ruling is the claim term language itself, there's nothing to add is, I guess, my point. But the point... Mr. Alcock, I'd like you to get to an act of conduct which you started to get to. And obviously, you're prepared to defend the district court's ruling that there was intent. First, before you address where the evidence of intent really was, outside of saying we want you to affirm, what's your response to the suggestion that we hold with pending Ferrisense? We don't believe that's appropriate, Your Honor. We think this case should be decided under existing law, and we don't believe that under this case, any change in the law would make any impact. And so on intent, I'll start with the 938, then go to the brief. Well, if we were to hold, ultimately, that there's a different standard for an act of conduct, the equivalent of fraud, which is one of the things that was raised in our order, setting the other case in bank, that could make a difference here. I believe this case has the level of intent of fraud. You said that under any standard that we might adopt, this case will come out the same way? Your Honor, what I meant to say is it would come out the same way under the higher level fraud of intent standard. And because on both the 938 and on the 351 patents, there was very strong evidence of intent in addition to materiality. Where was the evidence of intent? We found materiality, we found knowledge of materiality, but where did we find knowledge of intent? Okay, with respect to the 938, Your Honor, the circumstances surrounding the prosecuting attorneys getting the information, the highly material character of that information, the fact that when he got it, they were actively working with the litigation lawyers to file litigation quickly. Their decision to disclose in the continuation application, when it didn't matter, but to not disclose in the 938 application, when it did matter, with no principled basis for deciding to do it in one and not in the other. Couldn't that be negligence? Not under these set of circumstances, Your Honor. He admitted that they considered the thing, but then when questioned about it, he was highly evasive in his testimony in two areas, both under my questioning and under the judge's questioning, and the judge commented on his evasiveness. The two areas were his testimony about the cumulative nature of the Rosario Declaration and his testimony about why he filed it in the continuation application but not in the 938 application. And his testimony in both areas didn't make any sense, and it was exposed under cross-examination and under the judge's questioning. His cumulative testimony was, well, there were two references, Gresser and Winston, that disclosed the same thing, but even under his own testimony, they didn't. Under his own testimony, Gresser disclosed width and Winston disclosed depth. No reference disclosed both other than the one he withheld, and when the judge quizzed him on that, he had no answer. On the why disclosed in the continuation application but not in the 938, he said, well, I made a determination that it wasn't material because the existing references covered it. But the existing references were in the continuation application as well as in the application that he didn't disclose, and the judge in questioning said, your testimony doesn't make any sense. There's no principled distinction. So, Your Honor, It sounds like it wasn't really hidden. It was disclosed in the other application. Well, it was hidden, because remember, Your Honor, he didn't disclose it so that the patent would issue when they would file litigation. He didn't disclose it and knew the issue fee would be paid by him nine days later, and they would get the patent and be able to file the litigation. So it isn't a case like FMC or any of those other cases that counsel cites where the disclosure in the related application is evidence of innocence. In fact, here, it's evidence of intent because the intent was to get that patent issued because they needed to file the litigation really soon, and they did. They filed it within two and a half months. But nothing wrong with having the intent to get the patent issued. The question is, were they intended to fool the examiner, not tell the examiner something the examiner would have liked to have had? Well, exactly. And here, the fact that they disclosed it in the application that didn't count, that didn't matter. That was before the same examiner, wasn't it? It was before the same examiner. Well, at the time they disclosed it, Your Honor, it was out of the examiner's hands with respect to the 938 application. A notice of allowance had been issued, and so it was out of his hands. They would have had to, as the record discloses, file it and ask for it to be considered. And they knew that if they did nothing, the patent would issue, despite disclosing it in the other. Clearly, they did not want to disrupt the processing of that application so that it could issue properly. Clearly, they wanted to do that, and that was deliberate, intentional. No question about that. And it's clear that they thought about this, so that this was something that they did after giving it some consideration. But that still leaves open, does it not, the question of whether they were trying to mislead the patent office or mislead the examiner when it was their view that there were two other references that disclosed the same information. Maybe not collectively, maybe not the exact numbers, but nonetheless, it was there. Well, Your Honor, that's where the evaluation of the credibility of the witnesses on that very point is extremely important, because you're right, that's what they said, but what they said makes no sense whatsoever. Gresser, reading it, does not disclose line width. It says disclosed between 1 and 100, a wide range, and the patent is about precision. And Winston doesn't disclose the depth of the line. It doesn't disclose the line at all. And what they were withholding was actual inscriptions on a diamond done by one of the references already before the patent office that fell right within, dead on, the scope of the key elements of the claim. So you're right, that's exactly what they said. They said that. But it doesn't stand up under cross-examination, and that's why the witnesses looked horribly evasive when they were questioned on this subject, and why the trial judge found them to be so, because their testimony just doesn't add up. And it's similar on the 351 patent, and that kind of goes back to where I started, which is that there were two elements of the claim. One, the rigid aspect of it, the platform or frame aspect of it with all the elements tied together, and the increased immunity aspect of it. The one issue in the office action where the Gresser machine was withheld from the patent office had to do with the tying together of it. And as you pointed out, Judge Lynn, the Gresser patent doesn't say anything about the structure of the actual machine that was used. Anyone that looked at a picture of the Gresser machine, and there's a number of them in the record, would know that all the elements are tied together. It's astounding that counsel said that there was no evidence in the record on this. There's ample evidence in the record. There were pictures of the machine. Gresser and Rosario testified as to how the machine operated. What do you say they should have done? They should have given the examiner a picture of the machine? Or told the examiner that the machine that was built with the Gresser patent had a 1.5-inch thick aluminum base that all of the elements were tied on? Should they have brought in the machine? They could have given him a picture. They could have told him what it was. Let me tell you what I see as a problem. Unless they bring in the machine, no matter what they tell him, someone will turn around and say, well, you told him that, but that wasn't enough. You should have told him something else. Well, the manual has a perfectly accurate picture of all the details of the machine, and that was available to them. But here we're not even talking about what they should have done. They didn't, and they knew what the machine was. You have to figure out what they should have done, because you said they didn't, and the question is, they didn't what? Well, in the face of a rejection, saying the only way you get around the prior art is that the prior art doesn't have all the elements tied together on a solid platform, is what they should have done is told them that the prior art machine that my client has does have all the elements tied together on a platform, and in fact, they told them the opposite. They told them in an office action that the prior art, none of the prior art, had ever tied together all of the elements on a single platform. It was just not true, and it was not true demonstrably by a simple viewing of the machine. I mean, it's not something that you needed to investigate. Looking at the machine, which the record discloses the prosecuting attorneys did do, just looking at the machine knows that's a false statement. Mr. Alcock, you've treaded on your colleague's time. I assume you're representing the same party? Yes. Same side, different parties. I see, all right. Mr. Schaefer, we'll give you three minutes. Oh, thank you. So I see one of you is General Logical Institute. That's him. The police of the court of Ira Schaefer representing Photoscribe, one of the other defendants in the case. So just to add in a little bit on the rigid frame issue, the patent actually discloses in the summary of the invention that a preferred embodiment of the invention is bounding those three units on a common platform, and there was never any testimony that that was not what they meant by a rigid frame. In fact, the opposite came out during depositions or whatever. So there was never any question... That doesn't mean that there wouldn't be more structure than just a platform. Well, what I mean, usually what, since it talks about three elements having to be connected to the platform, so there has to be some, because there's a laser, there's the optics, and there's the diamond mounting stage, so they all have to be connected somehow to that, and so... There may be a difference between just connecting to a platform and having things connected to each other to prevent vibrations. Correct. So, in fact, the original contract that Lazar Kaplan signed with Mr. Gresser's company to make that actually called for this thick platform on which all these elements were mounted, and that was also on the record. So when LKI says that there was nothing in the record discussing the structure of the Gresser machine, we had Mr. Gresser himself come and describe how the machine was constructed. We had Mr. Rosario confirming that all the elements that were required for the contract were indeed in the machine, meaning this platform on which things were mounted. Mr. Shrave, we didn't reset the clock, but you have until minus 2.30. Oh, thank you, Your Honor. If you don't mind, we'll do it. I don't mind. So there was clear testimony as to the actual structure of the machine, and both Mr. Milde and Mr. Hoffberg, who were the patent attorneys for Lazar Kaplan for prosecuting this, both admitted that prior to actually preparing the patent application, they went and visited the Lazar Kaplan premises where they had one of these machines in New York, and they witnessed the machine in operation. So they saw exactly how the parts were connected together, at least visibly, and what it did. And you have to keep in mind also that this machine was in use by Lazar Kaplan for over ten years, and basically they were the exclusive diamond inscribers everywhere in the world based on these machines, and that these machines were perfectly suitable. There was never any complaints about vibrations or squiggly lines or anything like that. They worked perfectly fine. And so when having that information in front of them, they just went ahead and filed these new patent applications, just basically ignoring the previous machines. And I think what Judge Griselli was saying with regard to the 351, the rigid frame, when the examiner rejected the claims and said, I'm rejecting Claim 18 over the Gresser machine, which doesn't teach any kind of rigid frame, and Babel, which is some monstrous piece of equipment that has elements together, Mr. Milby came back and said, no, there's no teaching of a diamond inscribing machine that has these three elements, the laser, the optics, and the diamond holding stage, tied together on a common platform or on a common frame. It just said, all right. And I think what the court was saying is that when that occurred, that when the examiner made that rejection, it demanded of Mr. Milby that he come forward and say, well, look, I know you're saying that, but we have this other machine. Let me give you some details about it. Mr. Schaefer, I think the red light must have further questions. I think the red light does mean something now. Okay. Thank you. Thank you, Your Honor. If I could just make three quick points. First, on the Gresser machine and its materiality, defense counsel here is making the same mistake that the district court made, which is that the only evidence in the record is that the three elements were attached in some fashion to a common base in the Gresser machine. There is no evidence they were attached in fixed relation to one another so as to reduce the vibrational effects. And Mr. Gresser testified, as I indicated, that his machine couldn't do the precision in a normal office environment without being floated on air. And the battle rejection proves that rather than disproves it. On A-1951, the battle rejection was, quote, Battle et al. teaches in Figure 5 a rigid frame supporting the laser, the optical system, and the workpiece. And LKI's response to that was, he made no mention that the elements are rigidly connected and then went on to talk about known techniques and cement platforms and that the Gresser machine would have been redundant of that prior art before the examiner. In addition, pointing to the specification, I would point you, as Judge Luna was saying, the specification is the summary of the invention. The relevant part starts right before, I think, the part to which Mr. Schaefer was referencing. On A-113 in column 2, starting at line 51, the process according to the present invention typically achieves a positioning accuracy of about plus or minus one micron and then goes on to talk about how things are rigidly connected to reduce the vibrational effects. With respect to the Rosario Declaration, the prosecuting attorneys did give a reasoned explanation for why they filed it in the 948 rather than the 938. And they said in the 948, because it was still in normal flow, they sent it in. They didn't make an analysis about whether or not they needed to do it. They sent it in, because you're not limited to putting in only what you have to put in. And when it's in the process, you send it in. And in the 938, because there had been a notice of allowance, they looked at it very carefully to decide whether they needed to submit it. And they concluded that the prior art revealed what the declaration showed. And the Gresser and Winston patents do reveal the ability. And the prosecuting attorneys testified it was their belief that they did so, revealed the ability to do the depth and width shown. And I think the fact that both of the Winston patents revealed both depth and width. And the testimony of the prosecuting attorney was that he believed it to reveal both depth and resolution, meaning width. Finally, it can't be the single most reasonable inference on these facts that these attorneys intended to deceive the patent office. And for that reason alone, the judges can be reversed. With respect to the Fair and Sensible case, just to be clear, LKI believes that the district court can be reversed under current state of the law and that the district court is wrong here for several reasons, factual and legal. Certainly, if the court were to adopt a fraud standard like that reflecting the Supreme Court decisions, there's no way the evidence here could support a finding. Thank you, Your Honor. Thank you, Ms. Mahoney. We could call this case adjourned. We won't characterize it. We'll just decide it. We'll take it under advisement. Thank you.